AMERICAN GROCER PUBLISHING ASSOCIATION, Appellant, *v.* THE GROCER PUBLISHING COMPANY, Respondent.

*Trade mark — proprietary right in a name — when it is unnecessary to show guilty knowledge or fraudulent intent on the part of the wrong-doer.*

The plaintiff has for many years published in the city of New York a paper called the American Grocer. In 1875 one Price, who had theretofore edited the plaintiff's paper, left it and started for the defendant a new paper called the Grocer. Both papers were issued in pamphlet form, were of about the same superficial size and were addressed to similar objects. The plaintiff's paper had previous to 1875 been known as and called the Grocer, Price himself having so called it in his editorials, and a large portion of its correspondence

being so addressed. The defendant located its office in the same block and on the same side of the street as that in which the plaintiff had its office, and the plaintiff having subsequently removed to another place, the defendant did likewise. Price on leaving the plaintiff announced his withdrawal to its subscribers and his intention of starting a new paper.

*Held,* that even if the evidence failed to show an intention on the part of Price to encroach upon the plaintiff's business, yet the plaintiff was entitled to an injunction restraining the defendant from the publication of any paper called the Grocer or the American Grocer, as it had acquired a proprietary right in that name.

In such a case neither guilty knowledge nor fraudulent intent on the part of the wrong-doer need be shown.

APPEAL from a judgment, entered upon a trial at Special Term, dismissing the complaint upon the merits.

The action was brought to restrain the defendants from using the word " Grocer," either separately or in conjunction with any other word, as a name for a trade newspaper published by them.

The plaintiffs are a corporation and for many years prior to the publication of the first number of the defendant's paper published a paper in the city of New York called the American Grocer, which was known as and commonly called the Grocer. Mr. W. H. C. Price was its editor until 1875, when he ceased to act in that capacity and began the initiation of a new paper, the first number of which was issued on the 11th of December, 1875, and which was called the Grocer. Both papers were in pamphlet form and of about the same superficial size and were addressed to similar objects. It appears, in addition to this, that prior to December, 1875, the American Grocer was known as and called the Grocer, and was so designated by its subscribers. Mr. Price, during his editorship, himself frequently so called it in his editorials, and a large portion of its correspondence was so addressed. The circulation of the plaintiff's paper is by mail chiefly over the United States and Canada. The defendants' paper was started on the same block in this city, and on the same side of the street as the plaintiffs'; that is to say, the defendants selected as the location of their office the same block and side of the street as that adopted by the plaintiffs. It further appears that the plaintiffs having removed their office of publication to West Broadway, between Reade and Duane streets, the defendants did likewise.

The Grocer, as appears also from the testimony in the case, was started at the price of two dollars per annum for the avowed reason that the sum charged for the plaintiff's paper, three dollars, was too high. This is apparent, because in his prospectus Mr. Price said: "I shall put the subscription price at the very moderate rate of two dollars a year, having for some time been convinced that the price of the American Grocer was too high." It was further proved on the trial that no correspondence addressed to the Grocer came after that time to the plaintiff, and, further, that there was no other paper published in the city of New York with a name that would lead to its being called the Grocer.

Mr. Price testified upon the trial that the only reason the name Grocer was selected was because no other title could be thought of, that would indicate the purpose and character of the paper. But he admitted that he had heard of the Grocer's Price Current, and also the Grocer and Produce Review, neither of which was ever called the Grocer. And in reference to the location of its office of publication on the same block in Chambers street as the plaintiff, he said that it was at a time of the year when it was very difficult to make a choice; that they had found a vacant loft at No. 163 that would suit their purpose, and that they had moved to West Broadway because it was thought to be one of the best places in the city to have an office, and, further, that they had had their eyes on that locality for some time.

It appears, also, that when Mr. Price ceased to be the editor of the plaintiff's paper he addressed numerous of its subscribers, announcing his withdrawal from that publication and expressing his intention to establish a new paper. And it also appears by the evidence offered on behalf of the defendant that several dealers in the city knew of both papers, and likewise the difference between them. But there is some evidence in the case given on behalf of the plaintiff showing that some confusion existed in consequence of the similarity of the names of the papers, a part of the plaintiff's patrons having mistaken the defendant's paper for that of the former.

*E. More*, for the appellant.

*Hugh Porter*, for the respondent.

BRADY, J. :

The learned justice who presided at the Special Term disposed of this case in a very brief opinion, declaring that the views enunciated by Justice LAWRENCE upon the decision of the motion for an injunction seemed to him to cover the case as then presented. And the latter justice was evidently influenced by the facts that the whole equity of the complaint was denied and that the papers, after a careful inspection, did not present such a resemblance as would justify him, on such a motion as that which he was considering, in determining that the defendant's paper was intended to be passed off upon the public or that it would be likely to be purchased by the customers as and for the plaintiff's paper. He thought the case presented to him was within the rule laid down in *Snowden* v. *Noah* (Hopkins' Ch. R., p. 347), which he reviewed and commented upon.

The respondent relies upon the case, which was referred to by Justice LAWRENCE, and also upon the case of *Bell* v. *Locke* (8 Paige, 75), in which the chancellor refused to enjoin the publication of the defendant's paper; but that decision would seem to rest upon the ground that he did not regard the defendant's paper as such a simulation of the plaintiff's publication as to injure the circulation of the latter by deceiving the public and inducing the belief that it was in reality the same paper. This doctrine of resemblance seems to have been the controlling element in the consideration of both of these cases, and sustains the conclusion in regard to them which was adopted by Justice LAWRENCE in his consideration of the question involved.

Upon the question of the intent of Mr. Price there are perhaps strong circumstances tending to establish the fact that the original design was to encroach upon the plaintiff's business. These circumstances are the adoption of the name of the Grocer for his paper and the location of its offices in the immediate vicinity of those occupied by the plaintiff. It is quite apparent that many designations other than that of the Grocer simply, might have been employed for his paper, the adoption of which would not have resulted in any confusion. He knew that the plaintiff's paper was frequently designated the Grocer merely, and that he so called it himself whilst he was its editor; and it must be assumed from the position that he occupied that he had abundant intelligence to understand that some

trouble might arise in the receipt of the correspondence of the plaintiff's paper, which as he knew very often came addressed simply to the Grocer; and being so directed after the establishment of the new paper by him, it would go to the office of the latter paper, unless it was specifically addressed to the premises occupied by the plaintiff. This conduct may be entirely compatible with fair rivalry in journalism, but it must be admitted that it does not create that impression.

The plaintiff's paper had been well established, doubtless through the effective management of Mr. Price, and its reputation would therefore ensure its patronage, and it was entitled to protection from him as a citizen, unwilling to be engaged in any effort to destroy its value or interfere with its advantages.

But it is not necessary under the rules of law, as they now prevail in this State, in regard to trade-marks, to determine whether there was an intent to do wrong or not. The recent determinations of the Court of Appeals seem to place the right to protection upon the infringement of the proprietary right acquired by the use of a symbol or figure, or letter, or other form of device or name. It was distinctly said, for instance, in *Coleman* v. *Crump* (70 N. Y., 578), "neither is it necessary to establish guilty knowledge or fraudulent intent on the part of the wrong-doer. It is sufficient that the proprietary right of the party and its actual infringement is shown."

And in the more recent case of *Hier* v. *Abrahams* (82 N. Y., 524), the court said: "But where the trade-mark consists of a word, it may be used by the manufacturer who has appropriated it in any style of print, or on any form of label, and its use by another in any form is unlawful, * * * and this accords with the authorities. The goods become known by the name or word by which they have been designated, and not merely by the manner or fashion in which the word is written or printed, or the accessories surrounding it, and the unlawful use of the name or word in any form may be restained."

And the doctrine is declared in that case also, that an actual intent to defraud can hardly be deemed necessary to entitle the plaintiffs to restrain the defendants from continuing the unlawful use of a trade-mark, whereby the plaintiffs are sustaining damage;

and it is said that the violation of such a right is, in legal contemplation, a fraud.   If in this case, for example, it can be shown that any confusion is occasioned by the use of the name by the defendants in their business, it is a damage.   It would involve investigation, and it would, no doubt, lead to labor or create an element which would not necessarily enter into the business of the plaintiff and require consideration if the defendants' paper were not published.

The case of *Howard* v. *Henriques* (3 Sandf., 725) sustains the proposition that the use by the defendants of an imitation of the name of the plaintiff's paper should be restrained.   In that case it appears that the plaintiff's hotel was called the "Irving House," but it soon became generally known as the "Irving House" and "Irving Hotel" indiscriminately.   The defendants named their house the "Irving Hotel."   There was no question of resemblance between the two hotels or the two signs.   It was the name that was protected, not the name which plaintiff took, but one of the names by which his hotel was known.

In *Clement* v. *Maddick* (5 Jur. [N. S.], 592), the proprietor of Bell's Life in London and Sporting Chronicle obtained an injunction restraining the proprietors of The Penny Bell's Life and Sporting News from using any title which included Bell's Life, by which name the complainant's paper was known familiarly.

In *Ingram* v. *Stiff* (5 Jur. [N. S.], 947), the London Journal, a weekly paper, restrained the defendant from publishing a daily London Journal.   And Mr. Brown in his treatise upon trade-marks, sections 415 to 418, presents a very interesting synopsis of some French cases.   In one of the plaintiff's journals, the Moniteur Universal had become known as the Moniteur.   The defendant's paper adopted the title Moniteur Official of the French Empire.   It was held that the title of a journal is property, and the use of the word Moniteur, either singly or with the qualification Official, was enjoined for the reason that it incontestibly appeared that the Moniteur Universal, whether as a daily, political and literary sheet, or as an historical collection, had always been known by the simple title Moniteur.   In another case in which the publication was The Press, the Free Press was enjoined, although the papers belonged to different parties and addressed themselves to different classes of readers.

In another, the defendants having adopted the title Petit Journal, which was the title of the paper published by the plaintiffs, added the words *de la Somme*, which were printed in smaller characters. The judgment declares that the title of a journal is the exclusive property of its founder, and to give to a new journal the title already belonging to another would be a usurpation of property, and consequently an act of unlawful competition. An injunction was therefore granted forbidding the further use by the defendants of the words Petit Journal.

These French cases are in harmony with the decision made in *Howard* v. *Henriques* (*supra*).

In the *Dixon Crucible Company* v. *Guggenheim* (2 Brew., 321), it was said : " The name of a newspaper is a trade-mark, as much so as a label stamped upon a bale of muslin. Can it be supposed that if some one were to commence the publication in this city of a 'Public Ledger' of the same size, price and style as the one published by George W. Childs, that a court of equity would not promptly arrest the career of such a piratical craft by an injunction ? "

And in *Stevens* v. *De Couto* (7 Robt., 343), Judge MONELL said : "And I have no doubt that the names so long appropriated and used of the New York Herald, or the Sun, would be protected as trade-marks."

These authorities, with the enlarged doctrine as announced by the Court of Appeals in the cases to which reference has been made, leave no doubt of the right of the plaintiffs to the interposition of this court to protect it from the publication of any paper called the Grocer, or the American Grocer, the plaintiff's publication being well known by either or both of these names.

And the result of this review must therefore be to reverse the judgment of the Special Term, and to order a new trial, with costs to abide the event.

DAVIS, P. J., and DANIELS, J., concurred.

Judgment reversed, new trial ordered, with costs to abide the event.